# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

TINA PICKETT-BAISDEN, M.D.

     Plaintiff,

                                           Case No.

v.                                        Hon.

BLUE CROSS BLUE SHIELD OF MICHIGAN,
a domestic nonprofit organization,

     Defendant.

---

THOMAS R. WARNICKE (P47148)
Attorney for Plaintiff
Law Office of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031 (Direct)
(248) 930-4411 (Office)
tom@warnickelaw.com

---

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, TINA PICKETT-BAISDEN, M.D. ("Plaintiff") by and through her attorney, Law Office of Thomas R. Warnicke, PLLC, and for her Complaint against Defendant, states and alleges as follows:

## Jurisdiction and Venue

1.      Plaintiff, Tina Pickett-Baisden, M.D. ("Plaintiff"), an African American female, brings this civil action against Defendant for its depriving her of the same right in every State and Territory of the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, all of which were violations of Plaintiff's equal rights under the laws pursuant to 42 U.S. Code § 1981.

2.      Plaintiff is bringing this civil action for a declaratory judgment, permanent injunctive relief, attorneys' fees, costs, and to recover all damages, including compensatory and punitive damages, against Defendant for committing acts prohibited under federal law.

3.      Plaintiff, Tina Pickett-Baisden, M.D., currently is and has been at all times relevant hereto, a resident of the county of Wayne, and a citizen of the state of Michigan and within the jurisdiction of this court.

4.      Upon information and belief, Defendant Blue Cross Blue Shield of Michigan, (herein after referred to as "BCBSM" or "Defendant") is a domestic nonprofit organization, with its principal place of business located at 600 E. Lafayette Blvd., Detroit, Michigan.

5.    BCBSM is an independent licensee of Blue Cross Blue Shield Association. Founded in 1939, BCBSM is the largest nonprofit health insurer in Michigan and provides and administers health benefits to more than 4.3 million members residing in Michigan, as well as members of Michigan-headquartered groups who reside outside the state.

6.    Defendant BCBSM is duly authorized to conduct business in the state of Michigan.

7.    Venue and jurisdiction are proper in this Court pursuant to 42 U.S.C. § 1981 under federal question jurisdiction; as well as because Defendant does business within the jurisdiction of this Court; and the operative facts giving rise to the claims set forth herein took place within the jurisdiction of this Court.

## General Allegations and Statement of Claims

8.    Plaintiff re-alleges and incorporates by reference the paragraphs above.

9.    Plaintiff is a 61-year-old African-American female who has resided in the Detroit Metropolitan area, state of Michigan for the majority of her life.

10.    Plaintiff is a member of Renaissance High School's first graduating class.

11.    Plaintiff graduated from Northwestern University, Evanston, Illinois, in 1985.

12.    Plaintiff attended Wayne State University Medical School, graduated in 1991.

13.    Plaintiff completed her dermatology residency training at the University of Michigan (Ann Arbor) in 1995.

14.     Plaintiff achieved her American Board of Dermatology certification in 1996 and has remained certified since then.

15.     Plaintiff received her Michigan medical license upon graduation from her residency program in 1991 and has always held her medical license in good standing.

16.     Plaintiff applied as an attending physician for participation with Blue Cross Blue Sheild of Michigan (BCBSM) in 1991 and was approved for participation in all their products.

17.     Upon graduation, Plaintiff worked as an associate for Dr. Barry Auster until 1997.

18.     Plaintiff worked for Henry Ford Health System from 1997 through 1999.

19.     Plaintiff established her private practice, Bingham Farms Dermatology, in September of 1999 and ran it successfully and without incident until she closed the practice in July 2015.

20.      Upon closing her practice, Plaintiff returned to Henry Ford Health system from 2015 through 2017.

21.     Plaintiff resigned from Henry Ford Health System and worked for Advanced Dermatology and Cosmetic Surgery (ADCS) from approximately January 2017 through July 2020.

22.     Plaintiff resigned from ADCS in July 2020.

23.     Plaintiff worked for Midwest Center for Dermatology and Cosmetic Surgery (DOCS) from July 2020 through August 2022.

24.     Plaintiff worked as a locum tenems in Bismarck, North Dakota at Sanford Health System from approximately January 1, 2023, through May 2, 2023.

25.     Plaintiff currently works as a senior physician at the John Dingell Veterans Administration Hospital in Detroit since June 2023.

26.     Plaintiff also holds a voluntary junior faculty position at the Wayne State University - School of Medicine - Dermatology Department.

27.     Throughout Plaintiff's work history, she has held privileges at Detroit Medical Center, Ascension Health Care Systems, Beaumont Health System, Trinity Health System and Garden City Hospital System.

28.     During her employment history, Plaintiff participated in the BCBSM program for over 31 years without incident.

29.     Plaintiff was terminated from BCBSM on December 6, 2021.

30.     Prior to Plaintiff being terminated from BCBSM, Plaintiff had received an unannounced and impromptu visit from two BCBSM representatives, Mr. David Dunn and Ms. Amy Walker, in September 2019 at the Bloomfield Hills office of ADCS.

31.     Plaintiff learned later that day that they also visited Dr. Steven Grekin of ADCS in the Warren office, also unannounced.

32.    Dr. Steve Grekin did not meet with the BCBSM representatives.

33.    The BCBSM representatives questioned Plaintiff about the definition of the Acne Surgery procedure.

34.    They asked the Plaintiff to describe the procedure, what it entailed, what type of instrument was used, was there a substance that was used, and how was that substance used.

35.    Plaintiff answered all their questions about Acne Surgery without hesitation in a complete truthful manner.

36.    Mr. Dunn also asked Plaintiff about the Chemical Peels procedure and ADCS' use in the treatment of acne.

37.    The BCBSM representatives then asked Plaintiff specifically about the "GTZ" chemical peel, which is a proprietary chemical peel developed and owned by Dr. Steven Grekin and used in the ADCS clinics.

38.    Plaintiff completely and truthfully answered all of their questions about the GTZ chemical peels.

39.    Mr. Dunn informed Plaintiff that the chemical peel procedure was not the same as acne surgery, and Plaintiff informed Mr. Dunn that she understood that to be the case.

40.    Mr. Dunn informed Plaintiff that "introducing a sharp object into the pimple and expressing the contents" was the definition of acne surgery and Plaintiff again informed Mr. Dunn that she understood that to be the case.

41.    Mr. Dunn then asked Plaintiff if she ever worked with Dr. Steven Grekin and inquired about his billing practices.

42.    Plaintiff responded that she interacted with Dr. Steven Grekin at one meeting and when doing an educational spot on a local talk radio, or to discuss any necessary medical questions or clinic questions or concerns, but didn't work "with" him in the sense of working alongside of him treating patients.

43.    Plaintiff also informed Mr. Dunn that she was one of many employees of ADCS and that she had no knowledge of the billing practices of the company, which was handled by other employees.

44.    Mr. Dunn then asked Plaintiff if she owned the practice with Dr. Steven Grekin, did she receive bonus money for doing chemical peels, and did he sign off on her charts.

45.    Plaintiff responded "no" to all of his inquiries.

46.    Mr. Dunn informed Plaintiff that she had the second highest billing of Acne Surgery in Michigan and Plaintiff responded that she found that hard to believe.

47.    Plaintiff asked Mr. Dunn who the first highest biller of acne surgery was.

48.    Mr. Dunn said to Plaintiff, in a snarky way, "Well you know, it should be obvious."

49.    Mr. Dunn was clearly referencing Dr. Grekin as the first highest biller of acne surgery in Michigan.

50.    On the date of this visit with Plaintiff, Mr. Dunn had knowledge and or believed that Dr. Grekin was the first highest biller of acne surgery in Michigan.

51.    Upon leaving, Mr. Dunn and Ms. Walker left their business cards and stated that they would be in touch with Plaintiff.

52.    Before the BCBSM representatives left, Plaintiff asked Mr. Dunn and Ms. Walker what the next step would be and did she need to hire a lawyer, and all they said was that they would be in touch.

53.    Plaintiff immediately called Dr. Steven Grekin and Mr. Eric Hunt, who was ADCS' in-house counsel, to inform them of the visit by BCBSM.

54.    Dr. Steven Grekin and Mr. Eric Hunt made light of the incident and informed Plaintiff that she did not need to speak with them since they had not made an appointment and appeared unannounced.

55.    Dr. Steven Grekin informed Plaintiff that the BCBSM representatives had also visited his office earlier and he refused to speak with them.

56.   Dr. Steven Grekin informed Plaintiff that BCBSM representatives had visited his office unannounced on numerous occasions and that he didn't cooperate with them, and that Plaintiff was not obligated to cooperate with them either.

57.   When Plaintiff spoke with Mr. Hunt, he stated that he would speak with someone over at BCBSM that he knew.

58.   Plaintiff believes the person that Mr. Hunt was referring to at BCBSM was Mr. Bruce Henderson, in-house counsel at BCBSM.

59.   Plaintiff then promptly spoke with the manager at the Southfield ADCS clinic, Carolyn Kelley, and informed her of the visit from the BCBSM representatives, including what had transpired.

60.   In February of 2020, Plaintiff received a certified letter dated February 5, 2020 from BCBSM stating that she was being placed in a program called PPUR (Prepayment Utilization Review), a copy of the letter which is attached hereto as **Exhibit A**.

61.   Plaintiff immediately called and faxed the person identified in the letter, Deputy General Counsel for BCBSM, Nicole M. Wotlinski.

62.   Plaintiff was informed that she could not speak with Ms. Wotlinski, and that she had to speak with a gentleman/nurse named Thomas Rybarczyk, whose title with BCBSM was Provider Clinical Consultant from the Quality and Provider Education Dept.

63.     Mr. Rybarczyk told Plaintiff that because she had involved counsel from the practice, Dr. Eric Hunt, she could not communicate with the BCBSM lawyer.

64.     Plaintiff spoke with Mr. Rybarczyk and inquired as to why she was placed in the PPUR program, and he stated he could not say for sure.

65.     Mr. Rybarczyk stated that since Plaintiff was in the PPUR program, all of her claims would have to be submitted in hard copy, with the billing documents, before they would be paid.

66.     Mr. Rybarczyk did not offer any other information when Plaintiff asked him if this was all related to the visit from the BCBSM representatives in regard to acne surgery procedure and Mr. Rybarczyk would not confirm nor deny.

67.     Plaintiff discussed the situation with Mr. Eric Hunt, and he assured Plaintiff that he would contact BCBSM again regarding the situation.

68.     Mr. Hunt provided updates to Plaintiff of his interactions with BCBSM attorney Bruce Henderson.

69.     Mr. Hunt told Plaintiff that participating in this PPUR program was an educational action and not a punitive action.

70.     Mr. Hunt stated that there would be a meeting between Plaintiff and BCBSM to discuss the matter and how they would move forward towards a resolution.

71.     The meeting Mr. Hunt referred to was supposed to be with Ms. Laurie, but it never took place.

72.     Meanwhile, in July 2020, Plaintiff left ADCS and began employment with Midwest Dermatology and Cosmetic Center ("MDCC").

73.     Shortly after joining MDCC, and in September 2020, Plaintiff received another notice from BCBSM stating that her participation in the PPUR program was still in effect because Plaintiff's "error rate" was higher than normal and that she would remain in the program another 6 months, a copy of the letter which is attached hereto as **Exhibit B**.

74.     Plaintiff contacted Mr. Thomas Rybarczyk and asked him what an "error rate" was and was it regarding the Acne surgery procedure, and Mr. Rybarczyk only gave Plaintiff billing information and would neither confirm nor deny it.

75.     Plaintiff once again asked Mr. Thomas Rybarczyk why she could not speak to someone above him or on the "legal committee" to address the matter and he stated that he was the liaison between Plaintiff and the PPUR legal committee and she could only speak with him.

76.     Mr. Thomas Rybarczyk stated to Plaintiff that it was an ongoing investigation similar to a criminal investigation and that Plaintiff was the criminal, therefore she could not have access to information being used to investigate her, which Mr. Thomas Rybarczyk seemed to find humorous.

77.     Plaintiff asked the senior biller from Midwest Dermatology to speak with Mr. Rybarczyk, and she was also unable to get any further information.

78.     Plaintiff then spoke with Midwest Dermatology's CEO, Mr. Bob Macke, and asked for his assistance in the matter, and he obliged.

79.     Mr. Bob Macke later told Plaintiff that BCBSM was not cooperating with him or their legal counsel, and not returning emails or phone calls.

80.     Plaintiff requested to speak with their dermatology consultant, Dr. David Baird.

81.     Dr. David Baird stated that all of Plaintiff's claims over the past months had been normal.

82.     Plaintiff was issued a chart entitled "Corrective Action Plan" to fill out, detailing how Plaintiff would address and remedy the situation.

83.     Plaintiff reviewed the chart with the CEO and the senior biller, Ms. Dena Langman, who submitted the plan, but they never heard back from BCBSM on whether or not it was acceptable.

84.     Another 6 months went by, on or about June 3, 2021, Plaintiff received another letter from BCBSM indicating that her error rate was higher than normal and that if it continued to be higher, she could be terminated from the BCBSM program, a copy of the letter which is attached hereto as **Exhibit C**.

85.     A discussion took place between the senior biller from Midwest, Dena Langman, Mr. Rybarczyk and Plaintiff.

86.     During the meeting, Mr. Rybarczyk explained and admitted that BCBSM had made a mistake and that the error rate was in fact not higher than normal.

87.     Mr. Rybarczyk stated to Plaintiff and the senior biller that "things were looking favorable coming into the last PPUR legal committee meeting" which would be held December 6, 2021.

88.     After not hearing anything from Mr. Rybarczyk about the outcome of the December 6, 2021, meeting, Plaintiff emailed him on Jan 29, 2022, inquiring about the outcome.

89.     Mr. Rybarczyk emailed Plaintiff stating that she obviously did not receive BCBSM's December 6, 2021 letter, nor talked to the senior biller and that Plaintiff was terminated, a copy of the letter is attached hereto as **Exhibit D**.

90.     Plaintiff had not been in contact with Mr. Rybarczyk due to her mother being sick, going into hospice and eventually passing away.

91.     When Plaintiff asked Mr. Rybarczyk why she had not received a letter or email, he replied that a letter was sent to the main address of ADCS, which was their headquarters located in Florida.

92.     Plaintiff inquired as to why the letter would be sent to Florida when all other communications from BCBSM had been mailed to her current location in Michigan.

93.    Mr. Rybarczyk stated that because the credentialing department of Midwest Dermatology had not changed the address in the system, that was the reason it had been sent to that location and that it was not their fault.

94.    Mr. Rybarczyk stated this was a common mistake that credentialing departments make.

95.    Plaintiff asked Mr. Rybarczyk if the decision could be appealed, and he stated that the time had expired to appeal.

96.    Plaintiff asked Mr. Rybarczyk why her contract with BCBSM had been terminated and he replied that a letter would be sent now to the correct address.

97.    Plaintiff asked if Mr. Rybarczyk could simply email her the letter and he obliged.

98.    After Plaintiff received the email stating she was terminated, Plaintiff contacted Mr. Rybarczyk again to ask why her contract with BCBSM was terminated.

99.    Mr. Rybarczyk stated that BCBSM did not have to render an explanation to Plaintiff because the contract between the two was at will and they were not obligated to provide an explanation.

100.    Plaintiff asked Mr. Rybarczyk if Dr. Steven Grekin, and his clinic contract, had been terminated, and he replied, "oh yes, I am pretty sure they have been."

101.    Plaintiff asked Mr. Rybarczyk if the legal department from Midwest Dermatology could speak with the legal department at BCBSM and was told no.

102.    On February 10, 2022, Plaintiff received an email from Mr. Eric Hunt stating that he received a voicemail weeks ago that she was terminated from BCBSM, but that they had not received any notice and that to his knowledge the PPUR program was still ongoing.

103.    Once again, the CEO and legal department at Midwest Dermatology reached out to BCBSM numerous times and spoke with several executives and they were told that they were not obligated to speak with them due to the fact that they have the option to terminate Plaintiff at any time because the contract between Plaintiff and BCBSM was an "at will" contract.

104.    Plaintiff contacted BCBSM attorney Bruce Henderson and had a conversation with him explaining how she had been taking care of her dying mother, but had ultimately missed the deadline to appeal due to BCBSM sending the termination letter to the wrong address.

105.    Mr. Bruce Henderson continued to state that no appeal was available and the contract between the Plaintiff and BCBSM was "at will" and no explanation was needed.

106.    Plaintiff asked Mr. Bruce Henderson why Dr. Steven Grekin was not terminated.

107.    Plaintiff explained to Mr. Bruce Henderson that she was an employee of Dr. Steven Grekin and ADSC, that they were responsible for BCBSM billings, and why they weren't terminated as well.

108.    Plaintiff asserted that she was terminated because she was African American.

109.    After the above questioning, Mr. Bruce Henderson agreed to have a virtual phone conversation with Plaintiff.

110.    Mr. Bruce Henderson was asked during the discussion if he was familiar with Plaintiff's situation and had he discussed her situation with Mr. Eric Hunt of ADSC, which he denied.

111.    During the meeting Mr. Bruce Henderson indicated that because the contract between BCBSM and providers were "at will" contracts, no explanations were needed as to the cause of Plaintiff's termination.

112.    Mr. Bruce Henderson also indicated there was no appeal process.

113.    Mr. Bruce Henderson indicated that Plaintiff could immediately reapply to BCBSM since her termination was "without cause" as opposed to "with cause", which would have required Plaintiff to have to wait 3-4 years to reapply to BCBSH.

114.    Mr. Bruce Henderson stated that Plaintiff could reapply to BCBSM, and it should not be a problem.

115.    On or about August 2022, Plaintiff was released from her position at Midwest Dermatology and Cosmetic Center because her contract with BCBSM was terminated and because Plaintiff could no longer participate with BCBSM.

116.    Plaintiff spoke with other dermatologists about employment, and applied to other positions, all unsuccessfully due to not being able to participate in the BCBSM program.

117.    Plaintiff called Mr. Rybarczyk on or about October 2022, after re-submitting her application and as she was instructed to do.

118.    Plaintiff asked Mr. Rybarczyk why her application was re-routed to his department and that he must wear many "hats" since now he was the Special Reviewer on her case.

119.    Plaintiff was told by Mr. Rybarczyk that it could take sixty days for him to hear back about her application and that the credentialing process could take six months.

120.    Plaintiff expressed to Mr. Rybarczyk that she was not working at the time and that applying for new positions was next to impossible since she was not able to participate with BCBSM after her contract had been terminated.

121.    Plaintiff had another conversation with Mr. Rybarczyk on or about December 16, 2022, during which he told her that her application to rejoin BCBSM had been

denied and that the notification had mistakenly been faxed to Plaintiff's cell phone number.

122.    Plaintiff asked Mr. Rybarczyk if the proper protocol had been followed when BCBSM put her on PPUR and why she was not allowed a chance to speak with the investigative committee or provide any defense to the claims that were being made against her.

123.    Mr. Rybarczyk was unable to provide any definitive answers to any of Plaintiff's questions.

124.    Mr. Rybarczyk stated that he would get back to Plaintiff if he could get the answers to her questions.

125.    Plaintiff called Mr. Rybarczyk back that same day, and left a message asking him if he could please email the notification of the second denial letter that had been allegedly wrongly "faxed" to her cell phone.

126.    Plaintiff received the denial letter from Mr. Rybarczyk and attempted to call Ms. Ashely Ann Smith, whose name was listed on the letter, for additional information.

127.    Plaintiff placed three calls to Ms. Ashely Ann Smith and never received a response.

128.    Plaintiff spoke with the Veterans Affairs credentialing staff, and they stated that they had also put a call into BCBSM, specifically to Ms. Ashley Ann Smith, and that they had not received a response either.

129.    Over the next several months, there were a litany of emails and numerous phone calls between Plaintiff and Mr. Rybarczyk without any resolution nor any information given to Plaintiff that would justify, support or even explain Defendant's reasoning behind her termination from BCBSM and its failure to reinstate her contract when she reapplied.

130.    Incredibly, Dr. Steven Grekin, a white doctor, and his practice, ADCS, continued to be active participants with BCBSM, unlike Plaintiff, an African American doctor, who first unlawful had her contract with BCBSM terminated by BCBSM and who secondly did not have her contract reinstated upon Plaintiff's application, whereas Dr. Grekin suffered zero repercussions from BCBSM.

131.    Defendant failed to follow its procedures as to Plaintiff's contract, rights and privileges with Defendant, including her legal right to make and enforce contracts.

132.    Defendant failed to properly investigate the matter involving Plaintiff, ADCS and Dr. Grekin.

133.    Defendant turned a blind eye on a white doctor, Dr. Grekin, while imposing the ultimate professional death penalty upon Plaintiff.

134.    Each of the above violations of Plaintiff's rights were because of Plaintiff's race.

135.    Plaintiff, as the only African American doctor at ADCS, was targeted and treated in a discriminating manner because of her race.

136.    The adverse actions taken against Plaintiff would not have happened but for her race.

137.    Due to Defendants' discrimination and termination of Plaintiff's contract with BCBSM due to her race, as well as BCBSM's failure to contract with BCBSM when she reapplied, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of job benefits, loss of career opportunities, humiliation and embarrassment, mental and emotional distress, anxiety, indignation, depression, sleeplessness, loss of the ordinary pleasures of everyday life, inability to socialize and enjoy her community, including the right to a gainful occupation of choice. Plaintiff is entitled to equitable and legal relief, including compensatory and punitive damages, as well reinstatement of her contract and privileges with BCBSM.

## COUNT 1

## VIOLATIONS OF 42 U.S. CODE § 1981

## EQUAL RIGHTS UNDER THE LAW; AND

## THE CIVIL RIGHTS ACT OF 1991

138. Plaintiff repeats and re-alleges the allegations set forth above.

139. Pursuant to 42 USC 1981(a), all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

140. Pursuant to 42 USC 1981(b), the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

141. Pursuant to 42 USC 1981(c), the rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

142. In the Civil Rights Act of 1991, Congress amended § 1981 to further clarify and define the contracting conduct under its protection. Congress amended the law in response to the Supreme Court's decision in *Patterson v. McLean Credit Union*,

which construed § 1981 to exclude from its reach certain contract-related racial discrimination that occurs after a contract is formed.

143. As amended, § 1981 now defines the right to make and enforce contracts to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

144. Thus, § 1981's scope is not limited to racial discrimination in the formation of a contract. Racial discrimination in the performance or termination of a contract, among other things, may violate § 1981's contract clause.

145. Defendants' above stated actions deprived Plaintiff of her right to make and enforce contracts, to sue, be a party, to give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

146. Here, Plaintiff was not provided the same right to make and enforce her contract(s) with Defendant as was Dr. Grekin, a white doctor, and was subjected to discrimination that would not have occurred but for her race.

147. Defendant's unlawful discrimination and violations of 42 USC 1981 were deliberate and intentional.

148. Due to Defendants' discrimination and termination of Plaintiff's contract with

BCBSM due to her race, as well as BCBSM's failure to contract with BCBSM when she reapplied, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of job benefits, loss of career opportunities, humiliation and embarrassment, mental and emotional distress, anxiety, indignation, depression, sleeplessness, loss of the ordinary pleasures of everyday life, inability to socialize and enjoy her community, including the right to a gainful occupation of choice. Plaintiff is entitled to equitable and legal relief, including compensatory and punitive damages, as well reinstatement of her contract and privileges with BCBSM.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant, jointly and severally, as follows:

    a. Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future lost wages, income and benefits, pain and suffering, physical, mental and emotional distress;

    b. Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

    c. An award of interest, costs, and reasonable attorney fees;

    d. Legal and equitable relief that Plaintiff may be entitled, including reinstatement of her contract with BCBSM, an injunction prohibiting

any  further acts  of discrimination by Defendants; and

e.  Whatever other equitable relief appears appropriate at the time of

final judgment.

Respectfully submitted,

*/s/  Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorney for Plaintiff
Law Office of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031
tom@warnickelaw.com

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in this action.

Respectfully submitted,

*/s/  Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorney for Plaintiff
Law Offices of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031
tom@warnickelaw.com

# EXHIBIT A



**Blue Cross**
**Blue Shield**
of Michigan

OFFICE OF THE
GENERAL COUNSEL

600 E. Lafayette Blvd.
Detroit, Michigan 48226-2998

FAX: (313) 983-2470

February 5, 2020

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Tina Pickett-Baisden, M.D.
Tina Pickett-Baisden, M.D., PLLC
36700 Woodward Ave. Ste. 203
Bloomfield Hills, MI 48304

Tina Pickett-Baisden, M.D.
Tina Pickett-Baisden, M.D., PLLC
26400 W. 12 Mile Road
Southfield, MI 48034

Tina Pickett-Baisden, M.D.
Tina Pickett-Baisden, M.D., PLLC
31500 Telegraph Road, Suite 130
Bingham Farms, MI 48025

Re: Prepayment Utilization Review Procedure (PPUR)

Dear Dr. Pickett-Baisden and Tina Pickett-Baisden, M.D., PLLC:

Blue Cross Blue Shield of Michigan (BCBSM) conducted a review of claims that you recently submitted for possible irregularities. Effective immediately, all claims that you submit, whether as an individual practitioner or as part of a group, will be subject to a Prepayment Utilization Review (PPUR). PPUR is a review of your claims before payment may disburse. The PPUR procedures are enclosed.

Please be advised that PPUR applies to FEP, BCBSM PPO and traditional as well as BCBSM host claims. PPUR does not apply to BCN claims, Medicare Advantage and BCBSM home claims.

As part of the PPUR procedures:

- Your Professional Identification Number and National Provider Identification number are suspended in BCBSM's claims processing system; and
- You must submit hard copies of all medical records with supporting documentation for services you perform. Attach the medical records to the hard copy CMS 1500 claim form.

Mail all claims (with the exception of Medicare) with supporting medical documentation to the address below:

Blue Cross Blue Shield of Michigan
P.O. Box 311120
Detroit, MI 48231-1120

When including supporting documentation, be sure to follow the guidelines for physicians. The guidelines are located in the provider manuals on web-DENIS. Some of the guidelines include:

- Legible supporting documentation (preferably typed or block printed). Illegible documentation will be rejected;

- Summaries are not permitted;

- Copies of patient records are required; and

- Continue to follow normal procedures in any predetermination program with the final claim submission following the guidelines in this letter. Please note: Prior authorization is not a guarantee for payment.

BCBSM retains the right to audit PPUR claims. If there are any overpayments, you must reimburse BCBSM.

If you have any questions regarding PPUR, contact Laurie Latvis, Director of Provider Outreach at (313) 225-7778.

Very truly yours,

Nicole M. Wotlinski
Chairman, Audit and Investigations Committee
Vice President, Deputy General Counsel

NMW/ls

Enclosures

cc:      D. Crowell
         N. Burnett
         A. Wallace
         J.. Fritz
         L. Latvis
         D. Dunn
         CAS-012300

# EXHIBIT  B

DocuSign Envelope ID: 1C545D3B-A1EC-4BC3-9726-E60AD447E5D8

**Blue Cross
Blue Shield**
of Michigan



600 E. Lafayette Blvd.
Detroit, MI  48226-2998

September 30, 2020

*Certified Mail and US Mail
Return Receipt Requested*

Tina Baisden Pickett M.D.
PO Box 250433
Franklin, MI 48025

Tina Baisden Pickett M.D.
Midwest Center for Dermatology and Pathology
16510 19 Mile Road
Clinton Twp., MI 48038

   Re: Prepayment Utilization Review

Dear Dr. Baisden-Pickett:

Blue Cross Blue Shield of Michigan's Audit & Investigation Committee has reviewed your
compliance with Prepayment Utilization Review claims submission procedures and your claims
error rate. Based upon the claims submitted over the past 6 months, your error rate exceeds 10%.
As such, you will remain on PPUR for an additional 6 months. We will review your PPUR
compliance again in 6 months.

If you have any questions regarding PPUR, contact Laurie Latvis, Director of Provider Outreach
at (313) 225-7778.

Sincerely,

*Nicole Wotlinski*
F79AB95EAC6849F...

Nicole M. Wotlinski
Chairperson, Audit and Investigations Committee
Vice President & Deputy General Counsel

cc: L. Latvis

NMW/ls

Blue Cross Blue Shield of Michigan and Blue Care Network are nonprofit corporations
and independent licensees of the Blue Cross and Blue Shield Association

# EXHIBIT C

DocuSign Envelope ID: 7649C991-2149-4E32-B1DE-CC5D80C949C6

**Blue Cross**
**Blue Shield**
of Michigan



600 E. Lafayette Blvd.
Detroit, MI 48226-2998

June 3, 2021

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Tina Pickett-Baisden, MD
16510 19 Mile Rd.
Clinton Township, MI 48038

Dear Dr. Pickett-Baisden:

Blue Cross Blue Shield of Michigan's Audit & Investigation Committee has reviewed your compliance with Prepayment Utilization Review claims submission procedures and your claims error rate. Based upon the claims submitted over the past 6 months, your error rate exceeds 10%. As such, you will remain on PPUR for an additional 6 months.   At that time if there has been no improvement in your claim submissions, then Blue Cross Blue Shield of Michigan will have no choice but to consider the Departicipation process.

If you have any questions regarding PPUR, contact Thomas Rybarczyk, Provider Clinical Consultant at (248) 446-3836.

Sincerely,

*Nicole Wotlinski*

Nicole M. Wotlinski
Chairperson, Audit and Investigations Committee
Vice President & Deputy General Counsel

cc: T. Rybarczyk
    J. Martin
    A. Wallace
    J. Fritz

NMW/jg

Blue Cross Blue Shield of Michigan and Blue Care Network are nonprofit corporations
and independent licensees of the Blue Cross and Blue Shield Association

# EXHIBIT D

600 E. Lafayette Blvd.
Detroit, MI 48226-2998
bcbsm.com



**AIC MEETING**
December 6, 2021

## ACTION ITEM

### PPUR Status Review – Tina Pickett-Baisden, M.D.

**CFI Recommendation:** Tina Pickett-Baisden, M.D., remain on Prepayment Utilization Review.

**Investigator:** Dave Dunn

**Case ID:** CAS- 020343

| Provider/Group Name | NPI | PIN | PGIP (Y/N) | CAP (Y/N) |
|---|---|---|---|---|
| Tina Pickett-Baisden, M.D. | 1396753810 1518133404 | 0503988 | Y | N |

**Affiliated Address(es):** 16510 19 Mile Rd., Clinton Twp. MI 48038

**Original PPUR Date (if applicable):** January 16, 2020

**Provider/Group Specialty:** Dermatology

**Provider Networks:** Traditional, PPO Trust and Medicare Plus Blue PPO

**Current LARA License Status:** Active (expires 08/02/2024)

██████████████████████████████████████

██████████████████████████████████████

**Current Error Rate (if applicable):** 3.48%

**Payments made by BCBSM (exposure within scheme):** $262,032.56

**Previous 12-month payments made by BCBSM:** $87,938.30

**Factual Summary**

Tina Pickett-Baisden, M.D., was placed on Prepayment Utilization Review during a Corporate and Financial Investigation, ████████████████████. Dr. Pickett-Baisden was submitting claims for Acne Surgery when she (or another employee that the doctor would sign the medical records for) would perform a non-paid cosmetic procedure – a chemical peel. CFI recommends Dr. Pickett-Baisden remain on PPUR ██████████████████████

Physician Group Incentive Program (PGIP)   Corrective Action Plan (CAP)
Blue Cross Blue Shield of Michigan and Blue Care Network are nonprofit corporations and
Independent licensees of the Blue Cross and Blue Shield Association.                    Page 1 of 1